**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| OREGON RIGHT TO LIFE, | No. 24-6650 |
| *Plaintiff - Appellant*, | D.C. No. 6:23-cv-01282-MK |
| v. | |
| ANDREW R. STOLFI, in his official capacities as Department of Consumer and Business Services Director and Oregon Insurance Commissioner, | OPINION |
| *Defendant - Appellee*, | |
| and | |
| OREGON DEPARTMENT OF CONSUMER & BUSINESS SERVICES, | |
| *Defendant*. | |

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted June 17, 2025

San Francisco, California

Filed October 31, 2025

Before: Mary M. Schroeder, John B. Owens, and Lawrence VanDyke, Circuit Judges.

Opinion by Judge VanDyke;
Concurrence by Judge VanDyke;
Dissent by Judge Schroeder

## SUMMARY[*]

### Free Exercise of Religion/Abortion

In an action brought by Oregon Right to Life (ORTL), an education and advocacy organization that seeks relief under the First and Fourteenth Amendments from Oregon's Reproductive Health Equity Act's requirement that it provide abortion and contraceptive insurance coverage to its employees, the panel reversed the district court's order dismissing ORTL's complaint for failure to state a claim, vacated the district court's order denying ORTL a preliminary injunction, and remanded.

ORTL alleged that the Oregon Reproductive Health Equity Act (RHEA), as applied, violates its right to free exercise of religion under the First Amendment. Although ORTL is not, strictly speaking, affiliated with any particular

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

religious denomination and does not have a religious requirement for its board members, the directors on ORTL's board assert that their sincerely held religious beliefs guide their governance of ORTL. RHEA contains multiple exceptions excusing some religious organizations, including religious employers, from its abortion and contraceptive insurance requirement, but ORTL claims it does not fall within any of those exceptions, which Oregon does not dispute. The district court denied a preliminary injunction and dismissed ORTL's complaint on the grounds that there was "doubt" as to whether ORTL's beliefs regarding abortion were "genuinely religious," and that RHEA is a neutral and generally applicable law and thus subject only to rational basis review—which it satisfied.

The panel agreed with ORTL that its beliefs are religious and sincerely held. ORTL put forth significant evidence of its religiosity, and there was no conflicting evidence against ORTL's claim that its views are religiously grounded. The district court therefore erred by failing to conclude at the motion to dismiss stage that ORTL actually holds the beliefs professed in the complaint and that ORTL's opposition to abortion is genuinely religious. The panel reversed the district court's order dismissing ORTL's complaint and vacated the district court's order denying ORTL a preliminary injunction.

The panel expressed no opinion on the issue of whether Oregon's selective denial of a religious exemption to ORTL—whose beliefs about abortion were religious and sincere—violates the First Amendment's Religion Clauses. In light of the Supreme Court's recent decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), which reiterated the constitutional significance of exemptions granted to

some religiously motivated organizations but not others, the panel remanded this case to the district court to reevaluate, in the first instance, whether RHEA's application to ORTL violates the First Amendment.

Concurring, Judge VanDyke agreed with the majority that the unrebutted evidence in this case demonstrates that ORTL is motivated by religious beliefs, and those beliefs are entitled to protection under the First Amendment's Religion Clauses. He wrote separately to explain that under *Catholic Charities,* RHEA is subject to strict scrutiny because it discriminates based on theological choices and discriminates between religions. Judge VanDyke would, in addition to reversing the district court's dismissal of ORTL's complaint, order the district court to enter a preliminary injunction on behalf of ORTL because it demonstrated a strong likelihood of success on the merits of its First Amendment claim.

Dissenting, Judge Schroeder wrote that the district court's dismissal should be affirmed. The majority appears to suggest that ORTL may have been wrongfully denied an exemption as a religious employer under RHEA. Yet ORTL never asked to be considered a religious employer; the state of Oregon has never been asked to determine whether ORTL is a religious employer; and the record demonstrates that ORTL does not consider itself to be a religious organization. This case, therefore, is not similar to *Catholic Charities*, and a remand for the district court to consider the applicability of *Catholic Charities* is wasteful.

**COUNSEL**

James Bopp Jr. (argued), Richard E. Coleson, and Joseph D. Maughon, The Bopp Law Firm, Terre Haute, Indiana, for Plaintiff-Appellant.

Carson L. Whitehead (argued) and Denise G. Fjordbeck, Assistant Attorneys General; Benjamin Gutman, Solicitor General; Dan Rayfield, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendant-Appellee.

Alexandra Zaretsky and Jess Zalph, Americans United for Separation of Church and State, Washington, D.C., for Amicus Curiae Americans United for Separation of Church and State.

**OPINION**

VANDYKE, Circuit Judge:

This case arises out of Appellant Oregon Right to Life's ("ORTL") lawsuit against Defendant Oregon Department of Consumer and Business Services ("DCBS" or "Oregon") and Defendant-Appellee Andrew R. Stolfi in his official capacity as Director of DCBS. ORTL is an education and advocacy organization that "was formed in 1970 to proclaim and advocate for the inherent dignity of human life and to promote respect and protection for human life regardless of race, sex, age, or stage of development." Although ORTL is not, strictly speaking, affiliated with any particular religious denomination and does not have a religious requirement for being a member of the organization's board, the directors on

ORTL's board assert that their sincerely held religious beliefs guide their governance of ORTL. Specifically, as ORTL explained in this litigation, "sincerely held ... Judeo-Christian beliefs about the sanctity of human life and about abortion motivate the actions of ORTL [and] its board members." Consistent with that religiously motivated mission, ORTL does not wish to provide abortion and contraceptive insurance coverage to its employees. Oregon's Reproductive Health Equity Act ("RHEA"), however, requires entities like ORTL to provide such coverage. RHEA contains multiple exceptions excusing some religious organizations from that requirement, but ORTL claims it does not fall within any of those exceptions, which Oregon does not dispute.

ORTL brought suit under the First and Fourteenth Amendments seeking relief from RHEA's requirement that ORTL provide abortion and contraception coverage. The district court denied a preliminary injunction and dismissed ORTL's complaint on the grounds that there was "doubt" as to whether ORTL's beliefs regarding abortion were "genuinely religious," and that RHEA is a neutral and generally applicable law and thus subject only to rational basis review—which it satisfied. ORTL appeals, arguing that its beliefs are religiously motivated, and that RHEA's exemptions—extended to some religiously motivated organizations but withheld from others—render RHEA neither "neutral" nor "generally applicable" under *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 881 (1990). We agree with ORTL that its beliefs are religious and sincerely held. In light of the Supreme Court's recent decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), which reiterated

the constitutional significance of exemptions granted to some religiously motivated organizations but not others, we return this case to the district court to reevaluate whether RHEA's application to ORTL violates the First Amendment. *See Catholic Charities*, 605 U.S. at 241–42. We therefore reverse the district court's order dismissing ORTL's complaint, vacate the district court's order denying ORTL a preliminary injunction, and remand this action for the district court to apply *Catholic Charities* to the facts of this case in the first instance.

## I.

In 2017, the Oregon legislature enacted RHEA, a law that requires most "health benefit plan[s]" to cover abortion and contraceptive drugs. Or. Rev. Stat. § 743A.067. As relevant to this case, the statute has three exceptions to its insurance coverage requirements.

First, the "religious employer" exception provides that "[a]n insurer may offer to a religious employer a health benefit plan that does not include coverage for contraceptives or abortion procedures that are contrary to the religious employer's religious tenets," so long as the insurer notifies enrollees in writing. *Id.* § 743A.067(9). RHEA defines a "religious employer" as an employer:

(a) Whose purpose is the inculcation of religious values;
(b) That primarily employs persons who share the religious tenets of the employer;
(c) That primarily serves persons who share the religious tenets of the employer; and

> (d) That is a nonprofit organization under section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

*Id.* § 743A.066(4).

Second, RHEA's "legacy" exception provides that it "does not require a health benefit plan to cover … [a]bortion if the insurer offering the health benefit plan … [e]xcluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year." *Id.* § 743A.067(7)(e)(B). Although the parties dispute the precise reason Oregon's legislature included this exception, they agree that it was at least meant to carve out Providence Health Plans ("PHP")—a Catholic-sponsored organization operating under "the Ethical and Religious Directives for Catholic Health Care Services," which forbid providing abortion services—from the requirement to provide abortion coverage.[1]

Third, the "federal funds" exception provides that "[i]f the Department of Consumer and Business Services concludes that enforcement of this section may adversely affect the allocation of federal funds to this state, the department may grant an exemption to the requirements but only to the minimum extent necessary to ensure the continued receipt of federal funds." *Id.* § 743A.067(10). Some legislative history suggests this exception was included for entities that would qualify for federal protections under "the Weldon Amendment (a federal-funds conscience provision)." As relevant here, the Weldon

---

[1] This exception was included by the legislature in response to PHP's religious objections to providing coverage for abortion. PHP did not cover abortion in 2017.

Amendment provides that federal funds distributed by the U.S. Department of Health and Human Services may not be made available to a state if the state discriminates against health care entities that do not provide abortion. *See* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23170, 23172 (May 21, 2019) (to be codified at 45 C.F.R. pt. 88).

## II.

ORTL is an Oregon non-stock, board-controlled membership organization that is exempt from federal income taxes under § 501(c)(4) of the U.S. Internal Revenue Code. ORTL is opposed to abortion and thus asserts that it cannot "provid[e] insurance coverage for [abortion] without violating conscience." Its board members, who control the organization, have explained that their position on this issue is motivated by their religious beliefs. ORTL's employees likewise share its "beliefs about the sanctity of human life," and they accordingly object to ORTL providing insurance coverage that violates these beliefs and do not desire such coverage.

## A.

ORTL's religious motivations and beliefs are overt and long-established. They are announced throughout ORTL's governing documents, shared by ORTL's board, and have been publicly declared by ORTL since before this litigation. In its 2019 Restated Articles of Incorporation, for example, ORTL stated that "[t]he purposes of the corporation shall be carried out ... by means consistent with traditional Judeo-Christian ethics." This statement is reiterated verbatim in the "purposes" section of ORTL's bylaws. Particularly relevant here, ORTL's religious beliefs include "belie[f] in the sanctity of all human life from the moment of conception

to natural death," as stated in its publicly available Position Statement on Abortion published on ORTL's website. ORTL's use of the noun "sanctity" in describing its position on abortion is noteworthy. It independently evinces the religious grounding of the organization's belief, because "sanctity" is typically understood as a religious concept, denoting the state of being "holy" or "sacred." *See Sanctity*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sanctity (last visited July 11, 2025) (defining "sanctity" as "holiness of life and character" and as "the quality or state of being holy or sacred"); *Sanctity*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=sanctity (last visited July 11, 2025) (defining "sanctity" as "[h]oliness of life or disposition; saintliness," "[t]he quality or condition of being considered sacred; inviolability," and as "[s]omething considered sacred").

The verified complaint further establishes that ORTL's board members share and compel ORTL's religiously motivated opposition to abortion. ORTL has stated that "sincerely held ... Judeo-Christian beliefs about the sanctity of human life and about abortion motivate the actions of ORTL [and] its board members." ORTL has also explained that its "beliefs about the sanctity of human life … are held by its board members, officers, employees, and members, all of whom would be displeased if ORTL violated those beliefs and would likely disassociate from ORTL were it do so." And both parties in this case agree that under ORTL's bylaws "[t]he board is … responsible for adopting 'position statements for the corporation concerning life issues'"— which here includes ORTL's stated commitment to "the sanctity of human life from the moment of conception until

natural death" that "arises from Judeo-Christian religious beliefs."

Consistent with the religious beliefs held by its board members and expressed in its Articles of Incorporation and its bylaws, ORTL lobbied against the bill that would become RHEA in 2017. ORTL testified against the bill before two committees and asked for an exemption in the final legislation. Among other objections, ORTL explained that the bill would violate its "deeply held beliefs" and the Weldon Amendment.

Two years after the bill had passed, ORTL submitted an exemption request to DCBS, noting its belief that intentional facilitation of abortifacients is "religiously forbidden under traditional Judeo-Christian beliefs," and reiterating that "[t]hose sincerely held ... Judeo-Christian beliefs … motivate the actions of ORTL [and] its board members." ORTL's request was denied.

**B.**

In August 2023, ORTL initiated this action for declaratory and injunctive relief, alleging that RHEA as applied to ORTL violates its right to free exercise of religion under the First Amendment. In its verified complaint, ORTL sought an order compelling Oregon to accommodate its religious beliefs by treating ORTL "as 'religious employers' are treated" under Or. Rev. Stat. § 743A.067(9), which would permit ORTL to purchase an insurance plan that did not cover abortion.

The following month, ORTL filed a motion for a preliminary injunction, and Oregon subsequently moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on the grounds that

(1) ORTL had failed to show that its beliefs regarding abortion and contraception were religious in nature, and (2) RHEA is a neutral law of general applicability under *Smith*, 494 U.S. 872.

On September 30, 2024, the district court issued orders resolving these motions. The court concluded that ORTL failed to satisfy any of the requirements for a preliminary injunction. As to the likelihood of success on the merits, the district court concluded that the record in this case "cast[s] doubt" on whether ORTL's objections to abortion and contraception are "genuinely religious in nature," which in turn undermines ORTL's free exercise of religion claim. In a separate order, the district court granted Oregon's motion to dismiss on the grounds that RHEA is a neutral and generally applicable law subject only to rational basis review, which it satisfies. ORTL timely appealed.

## III.

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for failure to state a claim upon which relief may be granted. In considering a Rule 12(b)(6) motion, a court must accept a plaintiff's material factual allegations as true and view all facts in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). This court reviews a district court's decision to grant a motion to dismiss de novo. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021).

This court reviews the district court's denial of a preliminary injunction for abuse of discretion. *Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022). "In deciding whether the district court has abused its discretion, we employ a two-part test: first, we determine de novo whether the trial court identified the correct legal rule to apply to the

relief requested; second, we determine if the district court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (internal quotation marks omitted). "A decision based on an erroneous legal standard or a clearly erroneous finding of fact amounts to an abuse of discretion." *Id.* The district court's conclusions of law are reviewed de novo and its findings of fact for clear error. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## IV.

The district court erred by failing to conclude at the motion to dismiss stage that ORTL "actually holds the beliefs professed in the Complaint" and that ORTL's opposition to abortion is "genuinely religious."

## A.

The Supreme Court has instructed that when constitutional religious liberty rights "are extended to corporations, the purpose is to protect …. the religious liberty of the humans who own and control those companies." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014). Corporate structure is not relevant in this analysis. *See id.* at 717. The Supreme Court has affirmatively rejected the notion that religious protection does not extend to corporations with structures allowing for disagreement among owners about how to apply religious principles. *See id.* at 718–19. Recognizing that even the owners of closely held corporations sometimes disagree about such matters, *id.* at 718, the Court nonetheless directed that lower courts would simply need to look to the management structure of a corporation to resolve any

conflict, *id.* at 718–19. In other words, regardless of whether the corporation is closely held, and regardless of whether there could *theoretically* be disagreement about religious beliefs among those who control it, the decisive question is whether those in control have shared religious beliefs that are recognized and promulgated through the corporation.

Here, however, the district court concluded that its "doubt" about the religious basis for ORTL's beliefs "distinguish[ed] [ORTL] from the corporations that have been found to exercise religion in their own right," such as Hobby Lobby, and therefore "undermine[d] [ORTL]'s showing of likely success on the merits." That was error. Aside from being a non-profit organization (which, if anything, strengthens ORTL's claim that religious beliefs motivate its actions), ORTL is organized very similarly to how Hobby Lobby was at the time the Supreme Court made clear that Hobby Lobby exercised religion in its own right. ORTL has put forth significant evidence of its religiosity, and there is no conflicting evidence against ORTL's claim that its views are religiously grounded.

For example, ORTL's verified complaint—the evidentiary equivalent of an affidavit, *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)—repeatedly describes the religious nature of ORTL's objection to abortion. It states:

> ORTL's belief in "the sanctity of human life from the moment of conception until natural death," www.ortl.org/positions/ (Position Statement on Euthanasia), arises from Judeo-Christian religious beliefs—traditionally incorporated into Western Civilization's respect for human life—to which ORTL and

those who control it subscribe. Those include the Bible's command against the intentional destruction of innocent human life, making the taking of innocent human life a grave sin. These beliefs include the inviolable, inherent, ultimate worth of each human life, which requires respect for and protection of innocent human life by opposing abortion and abortifacient "contraceptives." And these beliefs include the consequent belief that it is a grave religious and moral wrong to deliberately cooperate, facilitate, or otherwise participate in some meaningful way in the provision of abortion or abortifacient "contraceptives," which belief precludes ORTL from providing insurance coverage for those without violating conscience.

Beyond this statement about the beliefs of "those who control" ORTL, the verified complaint expressly states that these religiously based "beliefs about the sanctity of human life" are held by ORTL's board members and "motivate [ORTL's] actions." ORTL also noted its belief "in the sanctity of all human life" yet again in the verified complaint, quoting from its online Position Statement on Abortion. Again, this is particularly noteworthy because ORTL's belief in the "sanctity" of life—as stated both in the verified complaint and in its longstanding position statement—independently evinces the religious nature of

ORTL's beliefs since, as explained above, "sanctity" is generally understood as an inherently religious concept.[2]

As further evidence of its religiosity, ORTL's Articles of Incorporation include the Judeo-Christian Operation Clause, and as Oregon acknowledges, ORTL's bylaws reiterate that statement verbatim. And this stated position is not the only evidence of ORTL's religious motivation that predates this litigation. As mentioned above, ORTL in 2017 expressed the "deeply held" nature of its beliefs; two years later, ORTL adopted the Judeo-Christian Operation Clause in its 2019 Restated Articles of Incorporation. That same year, ORTL publicly expressed the religious basis of its beliefs in numerous ways in its exemption request to DCBS. And in 2020, ORTL filed a complaint with the U.S. Office for Civil Rights based on those same religious motivations.

Courts are required to give "great weight" to this evidence in determining whether ORTL's beliefs "are, in [its] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 184–85 (1965). Oregon nonetheless argues that this articulation of ORTL's beliefs is insufficient to demonstrate religiosity, based almost entirely on the fact that ORTL's Executive Director answered in a deposition, "I don't know," when asked when ORTL had "referred to its opposition to abortion as a religious belief" outside of this

---

[2] *See Sanctity*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sanctity (last visited July 11, 2025) (defining "sanctity" as "holiness of life and character" and as "the quality or state of being holy or sacred"); *Sanctity*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=sanctity (last visited July 11, 2025) (defining "sanctity" as "[h]oliness of life or disposition; saintliness," "[t]he quality or condition of being considered sacred; inviolability," and as "[s]omething considered sacred).

litigation.  But the fact that the Executive Director failed to remember particular instances in which ORTL had described a particular belief in a particular way is not evidence that ORTL never did so.  It's just evidence that the Executive Director when put on the spot couldn't recall whether and when ORTL did so.  It certainly does not refute or weigh against the substantial evidence in the record that ORTL's opposition to abortion is a religious belief.

Indeed, ORTL's Executive Director had *already discussed* in that same deposition (and stated in verified form) various occasions when ORTL had asserted the religious nature of its beliefs, including: (l) its Articles of Incorporation, (2) its civil-rights complaint, and (3) its exemption request to DCBS.  Merely answering "I don't know" to a question asked *after* Oregon's counsel had already asked about and moved on from those three topics does not negate that the Executive Director had, multiple times, testified concerning ORTL's previous instances of presenting its beliefs as religious.  And again, the Executive Director's answer that the defendants in this case rely on so heavily is really a nonanswer.  She didn't say ORTL had not previously asserted that its beliefs were religious; she simply said that at that moment she couldn't recall when it had done so.

Particularly against the backdrop of the ample evidence limned above, no evidence in this case comes close to supporting the notion that ORTL's claim of religious motivation is "so bizarre" or "so clearly nonreligious" that it can be disregarded.  *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981).  And no evidence was offered to show that those in control of ORTL do not hold ORTL's beliefs about abortion or consider such beliefs to be nonreligious.  Indeed, other than the misguided reliance on

the Executive Director's "I don't know" statement, the evidence of ORTL's religiosity in this case is entirely one-sided and undisputed.

Our dissenting colleague disagrees, pointing first to ORTL's verified complaint and then to a statement of ORTL's attorney during the preliminary injunction hearing to contend that ORTL has admitted it "does not consider itself to be a religious organization" and has "never asked to be considered a religious employer." This assertion repeats the mistake made by the district court. ORTL asked for an exemption both when RHEA was passed and during this litigation. Because ORTL believes that it does not "fit the definition of a 'religious employer' under RHEA," it did not ask for an exemption *under the statute*. But the whole point of this lawsuit is that ORTL is seeking an exemption that it cannot get under Oregon law because of "the legislature's decision to pick and choose among religious organizations" with its narrow definition of "religious employer."

Similarly, the dissent mistakenly relies on the statement of ORTL's attorney during the preliminary injunction hearing that ORTL "is not a religious organization and does not qualify for … the religious employer exemption," a statement which, read in context, again suggests merely that ORTL does not believe it meets RHEA's narrow definition of "religious employer." The attorney made the statement while discussing RHEA's religious employer exemption, which the attorney understood as applying "in effect" only to "churches, mosques, or [synagogues]." And during the same preliminary injunction hearing the attorney noted that "the core belief of the Oregon Right to Life is based upon religious concepts and principles," referred to ORTL and similar organizations as "employers … motivated by religious concerns related to abortion," and discussed how

"religious concepts … motivate and animate and are the fundamental basis for the policies that Oregon Right to Life adheres to." The dissent is therefore incorrect in assuming that the attorney admitted that ORTL's beliefs are not religiously motivated. Instead, the attorney's statement is more plausibly read as an articulation of the same point ORTL has consistently articulated: that ORTL did not qualify as a religious employer *under RHEA*.

The dissent also questions ORTL's religiosity because members may join for nonreligious reasons and, according to the dissent, "traditional Judeo-Christian ethics … do[] not necessarily suggest the religious belief that life begins at conception." The latter rationale is easily refuted. It is unnecessary for us to conclude that Judeo-Christian ethics ineluctably require precisely the beliefs about abortion and contraception that ORTL holds. All that is necessary is for us to conclude that ORTL's beliefs in this instance are religiously motivated. As explained at length, on the current record in this case the religious motivation for ORTL's beliefs is both abundantly clear and unrebutted, and the district court erred in concluding otherwise. That someone else might derive different religiously motivated beliefs from their own view of Judeo-Christian ethics is irrelevant.

Similarly irrelevant is the dissent's concern about the "motivations of the individuals who become members" of ORTL. Whether ORTL's message is motivated by its religious beliefs does not turn on the motivations of every ORTL member. As already explained, it turns on the motivations of its controlling leadership and governing documents. The dissent's impugning of the religious character of ORTL's organizational beliefs could just as easily be leveled against churches and synagogues: perhaps some attend for social reasons rather than religious ones;

perhaps others attend merely "wish[ing] to please a relative." If the dissent was correct that organizations' religiosity turns on divining the pure "religious" motivations of all members, it is unclear whether any churches or synagogues would even qualify for basic First Amendment protections. We will not second-guess the unrebutted statements of ORTL's leadership and organizational documents that its beliefs are religiously motivated, based on bare speculation that perhaps not every member of ORTL shares those underlying religious beliefs.

The Supreme Court's decision in *Hobby Lobby* confirms that we cannot ignore the self-proclaimed religious foundation of ORTL's beliefs. Consider, for example, ORTL's Judeo-Christian Operation Clause. That clause is substantively indistinguishable from Hobby Lobby's statement of purpose that the Supreme Court found sufficient to demonstrate that organization's religious motivation. *See Hobby Lobby*, 573 U.S. at 710 n.23. Hobby Lobby's statement of purpose said that organization was "committed to Honoring the Lord in all we do by operating in a manner consistent with Biblical principles." *Id.* (cleaned up). The Court concluded that statement of purpose demonstrated Hobby Lobby sought "to perpetuate the religious values shared ... by [its] owners." *Id.* (internal quotation marks omitted). And although the *Hobby Lobby* majority mentioned additional evidence of Hobby Lobby's religious belief, it leaned *solely* on that statement of purpose to demonstrate that the for-profit corporation had a purpose of perpetuating its owners' shared religious values. *See id.*

ORTL's Judeo-Christian Operation Clause, which makes explicit its commitment to "carr[y] out … [t]he purposes of the corporation ... by means consistent with traditional Judeo-Christian ethics," does not differ

substantively from Hobby Lobby's commitment to "operat[e] ... consistent with Biblical principles." *Id.* at 710 n.23. And although the district court emphasized that ORTL "is not affiliated with any religious practice or institution and does not have any religious requirement for being an employee or director," the same was true of Hobby Lobby. Thus, regardless of whether ORTL's board members are "required to subscribe to [certain] beliefs," ORTL's Judeo-Christian Operation Clause—found in two of ORTL's governing documents—strongly evinces that ORTL is bound to religious beliefs in the same way Hobby Lobby was.

Oregon also argues in passing that there is insufficient evidence demonstrating the sincerity of ORTL's religious beliefs by pointing to the type of insurance ORTL has provided to its employees in the past through PHP—which covers abortifacient contraceptives, but not abortion (except in extraordinary circumstances). But that argument fails under *Skyline Wesleyan Church v. California Department of Managed Health Care*, 968 F.3d 738 (9th Cir. 2020), in which this court explained that beliefs cannot be discounted simply because an entity retains objectionable coverage when the alternatives would be an even worse fit. *Id.* at 748–49; *see also Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 482 (2d Cir. 1985) (describing as "distinctly unpalatable" the argument that one should be found not to have religious beliefs simply because he had to resort to the best of bad options).

## B.

This case presents a second issue: whether Oregon's selective denial of a religious exemption to ORTL—whose beliefs about abortion we hold are religious and sincere—

violates the First Amendment's Religion Clauses. On this second question, we express no opinion. The Supreme Court recently released a unanimous decision resolving questions in this area of law, *see Catholic Charities*, 605 U.S. 238, and we leave it to the district court to apply *Catholic Charities* to the facts of this case, including ORTL's religious beliefs, in the first instance.[3]

## V.

ORTL is a religiously motivated organization, governed by a board whose members have sincere religious beliefs, and with purposes to "be carried out ... by means consistent with traditional Judeo-Christian ethics." We therefore **REVERSE** the district court's order dismissing ORTL's complaint for failure to state a claim, **VACATE** the district court's order denying ORTL a preliminary injunction, and **REMAND** this action to the district court for further proceedings consistent with this opinion.

---

[3] The dissent contends that "Oregon Right to Life never asked to be considered a religious employer." This, the dissent believes, renders this case "unlike" *Catholic Charities*. Here again, the dissent mistakenly fixates on ORTL's concession that it falls outside Oregon's *statutory* exemption when in fact ORTL has consistently argued that the Constitution requires that it be exempted because of its religious status. Just like in *Catholic Charities*, ORTL's central argument in this case has always been that the statutory religious exemption in question is too narrow. *See Catholic Charities*, 605 U.S. at 241–42.

VANDYKE, Circuit Judge, concurring:

I agree with the majority that the unrebutted evidence in this case demonstrates that Oregon Right to Life ("ORTL") is motivated by religious beliefs, and those beliefs are entitled to protection under the First Amendment's Religion Clauses.  I write separately to explain my further view that under *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), Oregon's Reproductive Health Equity Act ("RHEA") is subject to strict scrutiny.  Indeed, it is rare to encounter a case with a Supreme Court case so clearly on point.

The Supreme Court's unanimous opinion summarized the First Amendment problem in *Catholic Charities* as follows: the organization was denied a religious exemption, but "could qualify for [a state's statutory] exemption … if they engaged in proselytization or limited their services to fellow Catholics."  605 U.S. at 249.  That is this case too. ORTL is a religious organization that has been denied a state statutory religious exemption to which it would otherwise be entitled if its purpose were "the inculcation of religious values" (i.e. proselytization), Or. Rev. Stat. § 743A.066(4)(a), and if it "primarily serve[d] persons who share [its] religious tenets," Or. Rev. Stat. § 743A.066(4)(c). Accordingly, I would not remand on the proper application of *Catholic Charities* when the question is squarely presented, the issue is briefed, and the correct answer in my view is inescapable.

## I.

The majority opinion recounts the facts of this case more exhaustively, so I emphasize only a few key points here. RHEA requires most Oregon health benefit plans to cover

abortion and contraceptive drugs. Or. Rev. Stat. § 743A.067. As relevant to this case, the statute has three exceptions to its insurance coverage requirements. The first exempts a select set of "religious employer[s]"; the second is a "legacy" exemption for insurers that "[e]xcluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year"; and the third allows the state to provide exemptions if it concludes that failing to do so "may adversely affect the allocation of federal funds to" Oregon. Or. Rev. Stat. § 743A.067.

Despite the statute having these exemptions (including for "religious employers") to its general requirement regarding abortion and contraceptive coverage, these exemptions do not apply to ORTL. Oregon argues that these exemptions do not favor the secular over the religious. Even assuming that is true, however, they are nevertheless not neutral under *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879–82 (1990), because they treat certain religious organizations more favorably than others, *Larson v. Valente*, 456 U.S. 228, 244 (1982). And that is no less forbidden by the Constitution than favoring the secular over the religious. *See Catholic Charities*, 605 U.S. at 253–54.

## II.

*Catholic Charities* controls this case. In *Catholic Charities*, the Supreme Court considered a Wisconsin law that required nonprofit entities to either contribute to the State's unemployment fund through payroll taxes or reimburse the State for benefits paid to their laid-off employees. *See* Wis. Stat. §§ 108.17–108.18, 108.151. But the Wisconsin statute had a carveout for religious employers.

*See* § 108.02(15)(h). As relevant here, organizations were eligible for the exemption only if they were "operated primarily for religious purposes." *See* § 108.02(15)(h)(2). To determine whether an organization's activities were "'primarily' religious in nature," Wisconsin looked to "whether an organization participated in worship services, religious outreach, ceremony, or religious education." *Cath. Charities Bureau, Inc. v. Lab. & Indus. Rev. Comm'n*, 411 Wis. 2d 1, 34–35, *rev'd and remanded sub nom. Cath. Charities*, 605 U.S. 238. And under that test, Catholic Charities was excluded because it "do[es] not 'attempt to imbue program participants with the Catholic faith,' 'supply any religious materials to program participants or employees,' or limit their charitable services to members of the Catholic Church." *Cath. Charities*, 605 U.S. at 249. "Put simply," the Supreme Court explained, Catholic Charities "could qualify for the exemption … if they engaged in proselytization or limited their services to fellow Catholics." *Id.*

The Court held that this was the "paradigmatic form of denominational discrimination," *id.* at 249, because "an exemption provided only to organizations that engage in proselytization or serve only co-religionists is not, on its face, 'available on an equal basis' to all denominations," *id.* at 251. "That type of 'explicit' distinction between religious practices is what [the Supreme] Court has deemed subject to strict scrutiny, including in the context of religious exemptions." *Id.*

It is worth pointing out that the unanimous Supreme Court emphasized that the issue in *Catholic Charities* (and *a fortiori* the issue here) was not a "hard call[]." *Id.* at 254. That was because the Court was breaking no new ground. *See id.* Since long before *Catholic Charities*, it has been

black letter law that the Free Exercise Clause bars laws that "discriminate[] against *some* or all religious beliefs," *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added), and one way to discriminate against "some … religious beliefs" is to privilege certain religious beliefs or actions over the disfavored beliefs or actions. Indeed, nearly a half-century ago the Supreme Court explained that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," observed that neutrality among religious denominations is "inextricably connected with the continuing vitality of the Free Exercise Clause," and recognized that the Religion Clauses prevent "religious gerrymandering." *Larson*, 456 U.S. at 244–45, 255; *see also Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) (explaining that the Establishment Clause means that governments cannot "prefer one religion over another"); *Zorach v. Clauson*, 343 U.S. 306, 314 (1952) ("The government must be neutral when it comes to competition between sects.").

Applying these principles, the Supreme Court has consistently applied strict scrutiny to laws that give preferential treatment to some religious conduct over other religious conduct. For example, the Supreme Court found "a municipal ordinance was applied in an unconstitutional manner when interpreted to prohibit preaching in a public park by a Jehovah's Witness but to permit preaching during the course of a Catholic [M]ass or Protestant church service." *Lukumi*, 508 U.S. at 533 (citing *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953)). Likewise, in *Sherbert v. Verner*, the Supreme Court held that "[t]he unconstitutionality of the disqualification of the Sabbatarian is thus compounded by the religious discrimination"

resulting from South Carolina's favorable treatment of Sunday worshippers and unfavorable treatment of Saturday worshippers. 374 U.S. 398, 406 (1963). And in *Larson v. Valente*, the Court considered a Minnesota law that placed higher administrative burdens on religious groups that emphasized "door-to-door and public-place proselytizing and solicitation" than religious groups with other emphases. 456 U.S. at 230–34. The Supreme Court deemed this a clear violation of the "principle of denominational neutrality" that the Court had "restated on many occasions," and the law was thus subject to strict scrutiny. *Id.* at 246; *see also Niemotko v. Maryland*, 340 U.S. 268, 272–73 (1951) (involving Jehovah's Witnesses who were denied use of a public park while other religious organizations were given access). As these cases show, decades of Supreme Court precedent prior to *Catholic Charities* made clear that "[t]he government must be neutral when it comes to competition between sects," including when offering religious exemptions. *Zorach*, 343 U.S. at 314.

## A.

The "principle of denominational neutrality" at the heart of *Catholic Charities* is exceedingly well-grounded in First Amendment doctrine. 605 U.S. at 247. Now try to find the daylight between *Catholic Charities* and this case. Oregon's RHEA sets forth a general rule of insurance coverage for contraception and abortion. Oregon provides an exemption for "religious employers," but ORTL is not eligible for that exemption because it does not have a "purpose" to "inculcat[e] … religious values" or "primarily serve[] persons who share the religious tenets of the employer." Or. Rev. Stat. § 743A.066(4)(a)–(c). The "inculcation of religious values" aspect of Oregon's definition cannot be distinguished in any relevant way from Wisconsin's

28          OREGON RIGHT TO LIFE V. STOLFI

consideration of proselytization.[1]  *Cath. Charities*, 605 U.S. at 244–48 (citing *Cath. Charities*, 411 Wis. 2d at 34–35). And RHEA's consideration of whether the employer chooses to serve individuals who do not "share the religious tenets of the employer," Or. Rev. Stat. § 743A.066(4)(c), is a mirror image of Wisconsin's focus on whether the organization chooses to "serve only co-religionists" or to "limit … services to [church] members," *Cath. Charities* at 249–50.  Because the Supreme Court has already held that denying exemptions to religious organizations on the basis of whether they proselytize or serve only co-religionists "facially differentiates among religions based on theological choices," there is no escaping the conclusion that RHEA's "religious employer" exemption triggers strict scrutiny.  *Id.* at 251.

It is also worth highlighting that Oregon's definition of "religious employer" so plainly discriminates against certain religious organizations that Oregon itself has conceded the point, characterizing repeatedly the "religious employers" to whom the exemption applies as "a narrow class of religious organizations."   For example, those who do not have "inculcation of religious values" as their purpose, but instead focus on feeding the poor, are excluded.  Or. Rev. Stat. § 743A.066(4)(a).  Indeed, Catholic Charities itself would be excluded under RHEA's definition, since its focus is almost exclusively on helping the poor, not inculcating religious

---

[1] *Proselytize*, *Webster's Second New International Dictionary* (1934) ("To proselyte; convert"); *Proselyte*, *Webster's Second New International Dictionary* (1934) ("To convert to some religion, opinion, system, or the like."); *Proselytism*, *Webster's Third New International Dictionary*, (1993); ("[T]he act of becoming or condition of being a proselyte."); *Proselyte*, *Webster's Third International Dictionary* (1993) ("[T]o convert from one religion, belief, opinion, or party to another.").

values. *See Cath. Charities*, 605 U.S. at 244 ("[R]eligious doctrine prohibit[s] Catholic bodies from 'misus[ing] works of charity for purposes of proselytism.'" (third alteration in original)); *see also id.* at 250 ("Many religions apparently impose … rules prohibiting proselytization or religious differentiation in the provision of charitable services."). So too would Hobby Lobby be excluded under RHEA's definition of "religious employer" since Hobby Lobby never maintained that evangelism is one of its main purposes. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 703 (2014). RHEA's "religious employer" exemption is thus *not* neutral because it draws distinctions on the basis of which religiously motivated activities it considers worthy of an exemption. *See also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) ("[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.").[2]

So Oregon's refrain that "RHEA is not motivated by animosity to religion" misses the point. A plaintiff does not have to demonstrate hostility to religion if a law discriminates between religions or religious motivations. *See generally Cath. Charities*, 605 U.S. 238. A government is not allowed to pass a law that favors Muslims over Christians, or Hindu beliefs over Muslim beliefs, regardless of whether the reason was actual animus toward one of those

---

[2] Oregon argues the core principle that the government cannot prefer one religion over another "has no bearing in this case because the exception [in RHEA] is for certain *types* of employers not certain religions." That response obviously flunks the *Catholic Charities* test. *See Cath. Charities*, 605 U.S. at 253–54. And necessarily so. *All* differential treatment of religions can be characterized as discriminating based on the "types" of religious organizations, not the religion itself. That is a distinction without a difference in this context.

religions or some more "benign" justification.  *See generally id.*

Finally, *Catholic Charities* also demonstrates that Oregon is simply wrong that the "religious employer" exemption "does not render the [RHEA's mandate] facially non-neutral" because it is a "protection[] for religious practice."  Whether characterized as a "protection" or not, the fact remains that the exemption "imposes a denominational preference," *Cath. Charities*, 605 U.S. at 254, and is the "paradigmatic form of denominational discrimination," *id.* at 249.  Indeed, the Supreme Court in *Catholic Charities* explicitly considered and rejected Wisconsin's argument that its exemption was constitutionally permissible because it did not "favor any sect, religion, or cluster of religions."  *Id.* at 251 (cleaned up).

"It is fundamental to our constitutional order that the government maintain 'neutrality between religion and religion.'  There may be hard calls to make in policing that rule, but this is not one."  *Id.* at 254 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).

**B.**

For the reasons I just explained, under *Catholic Charities* and decades of preceding case law RHEA discriminates based on theological choices and is therefore subject to strict scrutiny on that basis alone.  But that is not RHEA's only First Amendment infirmity.  The "legacy" exemption, which clarifies that RHEA "does not require a health benefit plan to cover … [a]bortion if the insurer offering the health benefit plan … [e]xcluded coverage for abortion in all of its individual, small employer and large employer group plans during the 2017 plan year," also

undermines RHEA's denominational neutrality. Or. Rev. Stat. § 743A.067(7)(e)(B).

Both parties spill a great deal of ink in their briefing arguing about the proper interpretation of this exemption, in particular whether the "legacy" exemption was intended to accommodate religious objections and accordingly whether it privileges secular conduct over religious conduct. Although those arguments raise interesting and challenging questions about the role of legislative history in statutory interpretation, they are somewhat of an irrelevant distraction here. Assume Oregon is correct that the "legacy" exemption does not privilege the secular over the religious because the purpose of the "legacy" exception was to benefit one religious organization—Providence Health Plans ("PHP"). Even granting Oregon that benefit of the doubt, the "legacy" exemption still discriminates *between* religions by deliberately providing exemptions to some religious organizations, but not to others, despite unexempted organizations presenting religious objections.

Oregon has explained that the "legacy" exemption "was enacted to accommodate [PHP]'s faith-based objection to providing coverage for abortion," "was intended to exempt … *only* [PHP]," and permits only "[PHP]'s religiously motivated conduct." Accordingly, Oregon contends that "the legislature created the [legacy] exception to accommodate religious objections." Indeed, the legacy exemption did not even seem to be a consideration until a PHP representative explained that PHP objected to the requirement to cover abortion before the Oregon House Committee on Healthcare.[3] PHP explained that, as a

---

[3] Testimony, House Committee on Health Care, H.B. 3391, March 15, 2017 (statement of Michael Cotton) (available at

Catholic-sponsored organization, it operated under "the Ethical and Religious Directives for Catholic Health Care Services," which forbid providing abortion services. PHP sought "a narrowly tailored conscience clause for insurers sponsored by a religious organization." At the next meeting of the House Committee on Health Care, Representative Sheri Malstrom explained that PHP and the sponsors of the bill had "found a path forward that resolves [PHP's concern]."**[4]**

While PHP—a "faith-based, not-for-profit health system"—was providing its testimony and seeking protection from the abortion and contraceptive coverage mandate, ORTL was likewise "testifying against [the bill] … and asking for an exemption in the final legislation." Ultimately, as Oregon acknowledged, the legislature crafted an exemption that was intended "to accommodate [PHP]'s faith-based objection to providing coverage for abortion," designed "to exempt … only [PHP]," and permit only "[PHP]'s religiously motivated conduct." Oregon has since discovered a second insurer that it claims also qualifies for the legacy exemption: Samaritan Health Plans. But everyone agrees that ORTL received no such exemption.

The fact that the legislature was aware of ORTL's religiously motivated desire for an exemption, and yet chose to offer only an exemption favoring other religious activity over ORTL's religious activity, demonstrates disparate

---

https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMe etingDocument/107514).

[4] Video Recording, House Committee on Health Care, H.B. 3391, April 14, 2017, 02:23:14 (available at https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=487961548 6&eventID=2017041305).

treatment of certain religious organizations and motivations—and worse, differential treatment that appears to be intentional. Whatever reason the legislature had for granting PHP (and Samaritan Health Plans) a religious exemption but not ORTL, such treatment cannot be characterized as religiously neutral.

The "legacy" exemption thus likewise runs afoul of the First Amendment. Indeed, Oregon's arguments in defense of the exemption only bring the nature of the constitutional infirmity into sharper relief. If one assumes ORTL's lead argument—that the "legacy" exemption privileges secular conduct over religious conduct—is correct, then there is a classic Free Exercise Clause problem under *Tandon v. Newsom*, 593 U.S. 61 (2021), *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), and many other recent cases. But if one instead assumes that the district court correctly concluded that "the purpose of the legacy exception was to accommodate existing restrictions based on religious objections," then the legacy exemption runs headlong into *Catholic Charities* and the prior precedent it relies on. This is because even if the district court and Oregon were correct that the legacy exemption was crafted to be a religious exemption and applies to multiple religious organizations, it is undisputed that it does not apply to ORTL's religiously motivated desire for an exemption. And again, the government can't discriminate between religions by accommodating one and not another, particularly when both accommodations would, in the same manner, undermine the government's alleged interest in providing generally available abortion and contraception coverage.[5]

---

[5] Because RHEA is transparently unconstitutional on two independently sufficient grounds—the "religious employer" exemption and the

This court's recent decision in *Youth 71Five Ministries v. Williams*, No. 24-4101 (9th Cir. Aug. 18, 2025), confirms this analysis. There we upheld a grant program that required applicants to not discriminate on the basis of religion when hiring employees. *Id.* at 4. Although that requirement prevented a religious organization from receiving a grant, the panel reasoned that such a program did not "*explicitly* differentiat[e] between religions based on theological practices," but instead merely had "the indirect consequence" of doing so. *Id.* at 14 (emphasis added) (quoting *Cath. Charities*, 605 U.S. at 250). Not so here, where the RHEA does explicitly and intentionally favor certain religiously motivated activity over other religious activity. The RHEA's narrow definition of "religious employer," *see* Or. Rev. Stat. § 743A.066(4), deliberately privileges certain religiously motivated activities, and the legacy exemption is explicitly meant to—and does—treat some religious organizations (PHP and Samaritan Health Plans) more favorably than others.

**III.**

Finally, it is also worth briefly explaining why it makes no difference whether ORTL couched its argument in Free Exercise Clause terms rather than in Establishment Clause terms. In short, the Supreme Court has told us it makes no difference.

*Catholic Charities* makes clear that the First Amendment's Religion Clauses—both the Free Exercise Clause and the Establishment Clause—forbid the

---

"legacy" exemption—I would not reach ORTL's arguments regarding the "federal funds" exemption, which present distinct and challenging questions that are unnecessary to resolve here.

government from favoring one religion over another based on theological practices. The Court itself styled its opinion as "revers[ing]" the Wisconsin Supreme Court's judgment that the statutory exemption did not "violate[] the First Amendment's Religion Clauses." *Cath. Charities*, 605 U.S. at 246, 254. The majority opinion also cited both Establishment Clause and Free Exercise precedent for its holding, including earlier case law holding that the "prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause." *Id.* at 248 (quoting *Larson*, 456 U.S. at 245). Indeed, as if to make the point even more clear, both Justice Thomas and Justice Jackson made plain in their respective concurrences that the "Religion Clauses"—not just the Establishment Clause in isolation—provide for denominational neutrality. *See id.* at 256 (Thomas, J., concurring) ("The Religion Clauses' special protection for the autonomy of religious institutions derives from at least three sources."); *id.* at 270 (Jackson, J., concurring) ("Because I agree that this distinction violates the neutrality principle of the Constitution's Religion Clauses, I join the Court's opinion in full.").

*Catholic Charities* makes unmistakably clear that the First Amendment's "Religion Clauses" do not permit the government to treat certain religious practices or denominations better than others. But even before the Supreme Court unanimously reiterated this point, the law was settled: Both the Free Exercise Clause and the Establishment Clause jointly *and* independently prohibit the government from giving preferential treatment to one religion over another on the basis of doctrine or practices. Suggesting anything to the contrary is like arguing that because a law prohibiting a Muslim from proclaiming his

belief in Allah would be unconstitutional under the Free Exercise Clause, an individual who brings a Free Speech Clause claim is left with nothing.  That is transparently wrong.  The Constitution has overlapping sets of protections to better safeguard the liberties of the people—the Religion Clauses are one example of that.

As I explained above, the Supreme Court has repeatedly emphasized that neutrality among religious denominations is "inextricably connected with the continuing vitality of the Free Exercise Clause."  *Larson*, 456 U.S. at 245; *Cath. Charities*, 605 U.S. at 248.  Many other cases have reiterated the same point.  *Cruz v. Beto*, for example, held that Texas violated the Free Exercise Clause by giving certain benefits to prisoners of Catholic, Protestant, and Jewish faiths, but withholding those benefits from Buddhists.  405 U.S. 319, 319–23 (1972) (per curiam).  And *Carson v. Makin* explained that an inquiry focused on use-based distinctions would raise "serious concerns" about "denominational favoritism" on Free Exercise grounds.  596 U.S. 767, 787 (2022); *see also Shakur v. Schriro*, 514 F.3d 878, 887 (9th Cir. 2008).

The upshot is that, as with other areas of the Constitution, the protections of the Free Exercise Clause and Establishment Clause are not hermetically sealed from one another.  Their ambits overlap, and the reach of the first is not limited by the reach of the second.  That is why the Supreme Court has explained that the Religion Clauses "appear in the same sentence of the same Amendment" and therefore a "natural reading of that sentence" indicates that the Clauses have "'complementary' purposes, not warring ones."  *Kennedy* v. *Bremerton Sch. Dist.,* 597 U.S. 507, 533 (2022) (quoting *Everson v. Bd. of Educ.*, 330 U.S. 1, 13, 15 (1947)).  And that is also why on many occasions the

Supreme Court has referred to the "Religion Clauses" in cases where the protections of both Clauses are implicated, and thus a plaintiff might have a viable claim under either. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012) ("[T]here is a ministerial exception grounded in the Religion Clauses of the First Amendment."); *N.L.R.B. v. Cath. Bishop of Chi.*, 440 U.S. 490, 507 (1979) (explaining that the NLRB's exercise of jurisdiction would "implicate the guarantees of the Religion Clauses"); *Cath. Charities*, 605 U.S. at 256 n.1 (Thomas, J., concurring) ("Although our decisions have grounded the church autonomy doctrine in both Religion Clauses, they have also made clear that the Free Exercise Clause is an independently sufficient basis for the doctrine.").

\* \* \*

For the foregoing reasons, in addition to reversing the district court's dismissal of ORTL's complaint, I would order the district court to enter a preliminary injunction on behalf of ORTL, which has demonstrated a strong likelihood of success on the merits of its First Amendment claim. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

"The First Amendment mandates government neutrality between religions and subjects any state-sponsored denominational preference to strict scrutiny." *Cath. Charities*, 605 U.S. at 241. Under the Supreme Court's decision in *Catholic Charities* (and decades of preceding case law), government action is subject to strict scrutiny when it denies a religious organization an exemption because it does not "engage[] in proselytization" or "limit[]

[its] services to fellow [church members]." *Id.* at 249. As the majority in this case now holds, ORTL is a religious organization and is motivated by religious beliefs. And under RHEA, ORTL would be eligible for the exemption that it has been denied if its purpose were "the inculcation of religious values" (i.e. proselytization), Or. Rev. Stat. § 743A.066(4)(a), and if it "primarily serve[d] persons who share [its] religious tenets," Or. Rev. Stat. § 743A.066(4)(c). RHEA's lack of an exemption for ORTL is subject to strict scrutiny, which Oregon has not argued it can satisfy.

---

SCHROEDER, Circuit Judge, dissenting:

This is quite a remarkable result. The majority appears to suggest that the plaintiff, Oregon Right to Life, may have been wrongfully denied an exemption as a religious employer under Oregon's Reproductive Health Equity Act (RHEA). Yet Oregon Right to Life never asked to be considered a religious employer. The case is thus unlike the Supreme Court's recent decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), and I trust on remand the district court will so recognize.

Oregon Right to Life is an organization of over 25,000 members with no requirement for membership other than a desire to join and a payment of $5.00. We cannot know the motivations of the individuals who become members. They could be motivated by religion, personal experience, or a wish to please a relative. Oregon Right to Life's board of directors must adhere to a number of "personal life perspectives" which contain no mention of religion. The majority asserts that only the views of those in control matter

and the views of members do not, even though the members select two board members who have voting rights.

As the district court accurately found, these facts readily distinguish Oregon Right to Life from the entities at issue in *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014). The companies there were closely held corporations, each owned and exclusively controlled by members of a single family, and they had all adopted explicitly religious resolutions. *See id.* at 700-04, 717. The Supreme Court explained that "protecting the free-exercise rights of corporations like [these] protects the religious liberty of the humans who own and control those companies." *Id*. at 707.

Oregon Right to Life originally sought an exemption from RHEA's requirements for its eight employees on the ground that its compliance with the statute would jeopardize Oregon's receipt of federal funds. When the agency denied that exemption, Oregon Right to Life filed a complaint in federal district court claiming a constitutional violation of the Free Exercise Clause. Oregon Right to Life contended, not that it was a religious employer, but that the lack of any applicable exemption burdened the free exercise rights of its members. The district court observed, correctly in my view, that the beliefs of its members were not necessarily religious in nature.

On appeal, Oregon Right to Life contends that the district court should have applied strict scrutiny. It does not argue the organization itself is entitled to an exemption as a religious employer, or that the state's application of that exemption may have violated the Establishment Clause. Indeed it could not have made those arguments, because the state never had occasion to consider whether Oregon Right to Life was a religious employer.

The record demonstrates that Oregon Right to Life does not consider itself to be a religious organization. For example, in its verified complaint, Oregon Right to Life alleged it did not fit the definition of a "religious employer" under RHEA "because (though it is nonprofit and its employees share its religious views) its purpose is prolife advocacy, not inculcating religious values, and it doesn't primarily serve persons sharing its religious tenets." It was even more direct at the preliminary injunction hearing: "And, of course, Oregon Right to Life is not a religious organization and does not qualify for the religious exemption . . . ." In her deposition, its executive director was asked, "Outside of this litigation, when has Oregon Right to Life referred to its opposition to abortion as a religious belief?" The executive director responded, "I don't know."

The only reference to anything remotely related to religion in this record is Oregon Right to Life's own statement in its corporate documents that its purposes shall be carried out "by means consistent with traditional Judeo-Christian ethics." Such a pronouncement of theistic origins does not necessarily suggest the religious belief that life begins at conception. Indeed many faiths with such origins, including, I believe, the Jewish faith, do not accept the premise that life begins at conception.

It was not until this court asked for supplemental briefing with respect to *Catholic Charities* that anyone ever suggested Oregon Right to Life was a religious employer. Thus, the case is not similar to *Catholic Charities*, where the state of Wisconsin was taken to task for applying too narrow an interpretation of what a religion is. The state of Oregon has never been asked to determine whether Oregon Right to Life is a religious employer. A remand for the district court to consider the applicability of *Catholic Charities* to this

case is simply wasteful. The district court's dismissal should be affirmed and I therefore respectfully dissent.